Oh, we have before us the Kelly matter and we'd love to hear from counsel. So please come forward and I'm confident you have some things to say and we have some questions to ask. Good morning, and may please the court. My name is John stimulus. I represent the appellants. Kevin Kelly and Kareem Bay in this rule 23 F appeal. I would like to reserve four minutes of my time. I'm sorry. I would like to reserve four minutes for rebuttal. Judge Greenway. And I also like to thank the court for allowing us to do this in person counsel for real page. Kareem and I were just discussing how difficult sometimes it is to communicate over zoom or other electronic means. So we appreciate it. With the time I have this morning, I would like to focus my argument on two points. The first is why we think we're in the right court, but federal courts have jurisdiction over this claim and why the plaintiffs have demonstrated standing. And the second point is why, in our view, that district courts misreading of section 1681 GA of the Fair Credit Reporting Act led it to erroneously conclude that no class could be certified here. First, on the article three issue, we are of the view that this court has jurisdiction and that we're in the correct court for the exact same reasons that the district court below found that the plaintiffs had standing. Siting this court's decision in the Nickelodeon Consumer Privacy case, and particularly the standard announced there that unlawful denial of access to information subject to disclosure, and that part was a quote, can constitute a concrete injury under article three. TransUnion has significantly changed the landscape since Nickelodeon and our Google decision. So when it comes to an informational injury, do you read TransUnion to put that as a category of injuries that's separating apart from intangible injury or is it a species of intangible harm? So, Judge Krauss, the way we see TransUnion versus Ramirez is dealing with a type of disclosure claim under FCRA section GA where the information is confusing. The statute provides that not only must there be a disclosure, but it must be clear and accurate. And there is a host of cases, including the Dreher case from the Fourth Circuit, where the claim is the information is confusing. In Ramirez, the argument was the information is provided, but in two envelopes. And this formatting issue is what leads to the violation and to the injury. The cases that stand with the complete deprivation of information, like this court's decision in Long, when the information that is sold in the marketplace, the background report information, was not provided at all, as opposed to the statement of rights, which is not bought or sold and no one does anything with it in the marketplace. But there's a disclosure section in TransUnion as well, right? The summary of rights was not included, as it should have been included, in the second mailing. So, I think the violation, as we read it, Judge Krauss, is that the statement of rights was included in the second mailing. So that was the whole problem in TransUnion, that there were two mailings that split the disclosure, if you will, in half. And what the court specifically says in TransUnion, and I think this is important, it says in discussing the 1681 GA claim, the plaintiffs, and I'm quoting, did not allege that they failed to receive any required information. They argued only that they received it in the wrong format, and the wrong format is italicized in Ramirez v. TransUnion. That's at 141 Supreme Court, the pinpoint is 2214. And in fact, in making that statement, the Supreme Court distinguishes its own informational injury standing cases in Aikens and Public Citizen. Now, those are the very cases that this court in Nickelodeon relied upon and cited in finding that informational injury, when the information that's required is not at all disclosed, provides standing. And we think Ramirez represents the second line of cases. It's not that the information wasn't provided, it's that it was confusing. Now, I think it's very difficult to argue about confusion when the information is not provided at all. So let me just, I apologize for interrupting, but we recognize that there's this distinction between confusing information and non-information, or non-provision of information. But when the Supreme Court kind of articulates that fork in the road, aren't they articulating that fork in the road just to do the later stages of the Article III standing analysis? So we say, hey, we've got confusing information, now we have to look at what harms come from confusing information, you know, real concrete harms that would come from confusing information. That's one fork. The other fork seems to be, well, if there's no information, then we'd have to look at what real concrete harms come from the non-disclosure of information. But I think that under either fork, I don't know that TransUnion says we now no longer require either fork to have a real concrete element. We know that the confusing fork does. But it strikes me as kind of very unusual to say that, yes, this fork in the road has it, but the other fork does not. So Judge Phipps, the way I would answer that is that I think both forks have the injury element. It's just that the injury is different. So the complete deprivation of information leads to the type of problem that the district court finds here. If you don't have the information at all, we're not talking about whether you're confused or misled by it. We're talking about whether you could act on it, you could do anything. Now, what if Kelly and Bay had this information at the time of their disputes and at the time of their disclosures? They could have gone to RealPage and said, you know, the court records that we're seeing here, they're not at all matching up with the records on our report about these crimes and evictions. You must be getting bad information from the source that you say you're getting your information. But the injury, the concrete injury would have to be either a physical injury. I don't think that's in play here. Or probably a financial type of injury, a dollars and cents sort of injury. And so just losing the possibility of going to RealPage doesn't necessarily feel like it has a dollars and cents component to it. And it's also a little bit belied by kind of later information that was developed in the case where your clients didn't, they didn't know what they do with the information. And they seem to say, well, you know, if I had it beforehand, I'm not sure what I would have done. So now we're talking about a metaphysical possibility that they didn't actually follow through with, which makes it even maybe a little more removed from a dollars and cents sort of injury. So, Your Honor, I think I could answer that in two ways. Yeah, there's a lot there. Yeah. First, we don't think this is a dollars and cents kind of injury. It's the intangible injury that the Supreme Court said could exist in the nature of defamation, invasion of privacy. But you have to show that it has a close cognate in the common law for it to be one of those sorts of intangible injuries, right? To be sure. And we think that this court's precedent in the Nickelodeon decision, horizon that follows it, the long, the part of the decision that is longer is acceptable to uphold standing, are consistent in finding that the complete deprivation of injury, not, I'm sorry, the complete deprivation of information, not getting at all, is an injury in itself. And it is distinct from the injury in Ramirez in our view, because as the district court found, if you have this information, not only could you go to the real page, you could go to the vendor, you could get this corrected from being spread in the future. The injury is a concrete injury in our view. Let me... What common law, what common law cause of action is it closest to? You know, you've got to kind of say, hey, it's close to this common law family of claims. It's a cognate of one of these sort of... Which ones should we say, which ones should we look to, what's kind of your greatest hits in terms of what common law claims we should be looking at to compare this to? That's an area that's not fully developed, Judge Fitz, but I think that the measure of privacy is what the Third Circuit has repeatedly looked to. We suppose that negligence or even fraud are common law analogs to being, you know, deprived of an omission of information that's material to correcting a problem. But we do think that there is an injury here and that the landscape changed by Ramirez... Can I just... I'm so sorry to back you up, but let me just go through each one of those. Negligence has a causation element. I don't know that this statutory violation has a causation element. Fraud has justifiable reliance and a causation element. I don't know that this statutory cause of action has either. And then with invasion of privacy, that's kind of going the different way on information flow. That involves the release of information, not the nondisclosure of information. So I guess if those are your best cognates, I see problems with mapping the elements of each of those in a way that looks like it's traditionally in what's recognized by the common law. What do you say? For sure, they're not perfect duplicates. But the Supreme Court tells us that it does not need to be a perfect duplicate. It needs to be something that Congress enacted to provide a particular remedy that has a basis in the types of harms that have traditionally recognized in American courts. And in fact, if this exact cause of action existed at common law, the FCRA wouldn't be required at all. So we think that the G claim is based on common law. And in this situation, the Ramirez decision is not controlling this circuit's decisions in the collodion. And those that followed in Horizon and Long are helpful in finding standings. Isn't it problematic that you're unable to identify when we talk about common law claims, and particularly tort-based claims? Isn't it problematic that you're having difficulty now identifying them? What are we supposed to do with that when we're thinking about not just the class representatives, but the class itself, and identifying the class and thinking about issues of predominance? Your Honor, I see my time is up. May I answer? Oh, we've got plenty of time. Thanks a lot with regard to the red line. Thank you, Your Honor. I do think that the case law up to this point has indicated that invasion of privacy is the closest analog. And here's how I think that works. I don't think it needs to be the only analog to the common law. But invasion of privacy... Invasion of privacy for an informational injury? Yes, sir. Okay, go ahead, please. The argument goes that the purpose of credit reporting is to safeguard certain information and to have it used in the marketplace only for permissible purposes. In this case, it would be tenant screening. One of the rules in reaching that goal is having access to your information and being able to dispute and have it corrected before it gets disseminated or before future disseminations. And we think that analog is close enough to what's going on here. What Kelly and Bay want is information that would allow them to protect their privacy from a false light dissemination. Let it happen here. This wasn't theoretical. It happened to them at the St. James just a few blocks away in an apartment complex in California. And it could happen again unless they have access to where the information is coming from. They could dispute it. They could correct it. They could get the source to stop selling it to others. And we think that that's... So your tort claim is a reputational false light claim? I think that's the closest one, Your Honor, but it doesn't have to be the only one. But I think the law, including this circuit's law, cites the privacy claims. Before TransUnion. Before TransUnion, yes, Your Honor. About the premise of the question, I just want to clarify that it's your view that informational injuries do require that there be a common law analog. And are not just treated as something separate. They've discussed somewhat separately in TransUnion, right? And discussed in terms of disclosures under the Sunshine Law or the downstream consequences. If public citizen and Aikens remain good law as to standing, do we really need an analog to the common law? Or is it something else that we're looking for in terms of the ability to protect a right that Congress has recognized? And if so, how does that translate here? So I think Aikens and public citizen do remain good law. And there are informational injury cases that the TransUnion v. Ramirez Court distinguishes and says, well, that's not what we're dealing with here because the information was provided and it was confusing. I do think TransUnion v. Ramirez says you must have some common law analog in any case in order to establish Article III standing for any claim as I read that decision. But it doesn't say that the analog needs to be perfect. So in that case, it was defamation. But, of course, defamation also has elements that were never satisfied in that case. And that was not troublesome to the court. I think what the court is saying is that federal courts should not exercise their power, their jurisdiction, in cases where there is no concrete injury that has some relation to the common law. And we think there is here. But, I mean, when we're asked what the sum relation is, right, are we supposed to just say, hey, there's a commonality of purpose between what the common law cause of action tries to remedy or vindicate? Or should we look at some closer analog in terms of maybe an elemental sort of comparison between what it is? Because it strikes me that if it's just the commonality of purpose, then you're going to get a lot of statutes who have remedial purposes to make someone whole. And everyone would just say, oh, yeah, that's tort. And if it's elemental, then you've got a lot of problems because I don't know that there's a commonality of one of the false light elements. And false light isn't recognized. It's borderline common law. A lot of states don't recognize it. The Supreme Court doesn't reference it in Ramirez. But I don't know that false light has a single elemental commonality with a 1681 claim. So I've had two questions in there. Is it purpose? And if it's elements, where's the commonality? So that's a really good question. And I'm not sure that I have an answer to it or that TransUnion versus Ramirez explains it in any detail. We do know some things that every element doesn't need to be met. In TransUnion, the defendant argued, well, this information is not even inaccurate or false. It might be misleading or it doesn't match up perfectly. And the Supreme Court said, well, it's close enough, though. So I think the elemental approach, it would seem to me, is not required. Maybe a strict elemental approach isn't. It would be strange if you said there's zero elements in common. So this is the challenge after Ramirez, which is how close is close and what exactly do you look at? And I don't know that the Supreme Court fills in a lot of the gaps, Your Honor. So I think that the answer to Krauss's question from earlier, I think the common law analogy has to take place. But how close is close and exactly what that means, I think, is an open question. We do think that there are common law analogs. In this circuit, privacy has been the one used in the most analogous cases. So that's the best I have. I'm sorry. Oh, no. You know, I always have felt like it's like double dutch, you know, when do you get in? It sounds like we're coming towards the end. So both of us obviously are better double dutch players than Judge Dips. In any case, I wanted to just change our focus for a moment and talk to you about the file consumer report issue. Yeah. Yeah.  So, you know, to trigger the 81-G, right, a consumer is required to specifically request their file as opposed to consumer report. And there seems to be some question in the briefing about, you know, is a file exactly a consumer report? And in Cortez, we obviously said that they're separate. The statute treats them separately. So I wondered if you could chat with us about that. So absolutely, Judge Greenaway. I'm going to give you a little bit of a long-winded answer here, but I think it's important that, you know, first I want to say that if this court determines that there is no federal court jurisdiction, argues that you cannot get to this issue, that all of the decisions of the district court below on the 1681-G claim are vacated, and that we go to state court to decide these very important federal statute issues. Now, in our view, there's a very clear requirement on the agencies in Section 1681-GA. The statute says every consumer reporting agency shall, then upon requesting proper information, clearly and accurately disclose to the consumer all information, the sources, the users. There's not a requirement on a consumer to do anything besides make a simple request. The request doesn't need to be in writing. It doesn't need to be direct. It doesn't need to be specific. It doesn't need to use magic words. It doesn't need to say I need the sources. I want the end users. I want a file or a consumer report. Nor could any consumer be expected to know the meaning of those terms. The industry should be expected to know the meaning of those terms. There are regulated industries that sells this information, and the way it operates, Your Honor, is virtually everywhere. A consumer makes a request in any manner, and the industry provides the file. It's exactly what happened here. They accepted requests in every manner, direct and indirect, in writing, over the telephone, over the webpage, and they provided a single document, the rental report, which was the file. I believe that the district court's rationale that the consumer must make a direct dispute and must request a complete file, as the district court says on page 12 of its decision, is not only inconsistent with statutory text, the plain reading, the purpose of the statute, it will turn this entire industry upside down. Consumers right now receive their files indirectly every day through resellers, on the Internet, through their banks, their credit card companies. All of these requests are indirect. I'm sorry, isn't that a different issue? Judge Greenaway was asking you about the consumer report versus file, and it sounds like you've moved on to the topic of the direct request, the subclass of the indirect request versus the $2.2 million broader class if it's indirect. Are those different issues? I think there are two different issues, but they're both encompassed in the holding of the district court. Well, take a moment and let's just answer the first question, which, Judge Krause, this is great. That's why she gave me an assist. So on the question about what the consumer must request, whether they do it directly or indirectly, the statute does not specify. It just says make a request. I believe requiring a consumer to be more explicit, I want a request for my rental report or my file or some element of my file, is not what the statute contemplates in its plain language. It's going to create this two-tiered system, and then it's going to lead to massive confusion as to are these agencies making reports available, files available? Well, then what are we supposed to do? Are you suggesting that we meld the two, despite the fact that they're separately defined, that we meld them, that we meld file on the one hand and consumer report on the other? So I think, Your Honor, what the statute does in this definition— Because the practice that you've described, that's fine, but, you know, we're not trying to figure out, oh, what's the practice? We're starting with what the words are, yeah?  The statute of 1681G has a single disclosure. It's the file. It's everything—sources, users, everything—upon any request. It's the simplest language possible and the simplest method possible, and we think what the district court does is separate those. It says that you must make a specific type of a request and then for a specific type of information, and we think that's not what the statute requires at all. How do you get around our comment in Cortez? I'm sorry, Your Honor? I said, I'm sorry? How do you get around our comment in Cortez? I don't— I need a little bit more help, Your Honor. Oh, oh, I'm sorry. Which comment? I have it for you. So in discussing the definition of file in Cortez, we noted that the term consumer report is also defined in 1681A, and it is unlikely that Congress intended the two terms, right, consumer report and file, right, to mean exactly the same thing. That's a quote from Cortez, right? So despite how other courts have interpreted 1681G, how do you get around that statement in Cortez? So we definitely think that file and consumer report are defined separately and have separate functions. Consumer report is used in multiple sections of the statute. The B section that the district court below cites about permissible purpose, the industry must have a permissible purpose to sell a consumer report. In the EB section concerning maximum possible accuracy, those third-party reports must be prepared following procedures that assure accuracy. But when a consumer asks for information about themselves under section 1681G, what the statute provides is upon a request, the agency shall provide the file, and the file is everything. It cannot be a subset of the file. The consumer report may be a subset of the file, but the agency's responsibility, the agency shall disclose clearly and accurately the file. It's not that the consumer must ask for it. It's what the agency must do. And in fact, that is the simplest approach. It's consistent with statutory... Can I just jump in? Is credit score part of the file? It's not. Okay. So it's different. There's a different section on credit scores and when they need to be disclosed, paid for, et cetera. If you're going to read subsection A to be the request for the things that follow, why shouldn't we look at the statute in terms of one through six as individual items that need to be requested? One being the information in the file at the time of the request, and we can discuss whether that actually means report given some of the history and the way it's been interpreted by some courts like Gillespie. But sources of information is a separate item. Do we need to look then for a specific request for sources in addition to all information in the consumer's file? Assume for the moment that we read that to mean consumer report, not to mean everything in the file rendering two through five superfluous. So I do think that the district court's rationale would require that. It would require an a la carte system where the consumer has to make a specific request for sources, a specific request for end users, a specific request for a file or for a report. I do not believe that the statute says that or contemplates that. And I believe that in practice, if that's put in practice, it's going to create massive burdens and confusion, not only on consumers, but on businesses who have to sort out what exactly is this person asking for, how are we going to make that available, through what means of requests. And I don't think that this statute is intended, first of all, it doesn't say that. I'm sorry, but let me just direct you to this subsection 6 of 1681 G.A. 1. It says, it's the one section that seems to contemplate a topical nature to the request. It says, quote, if the consumer requests the credit file and not the credit score, a statement that the consumer may request and obtain the credit score, end quote. So, what it seems to suggest, I mean, what do you make of that? Because what it seems to suggest is, hey, look, the statute's contemplating that certain requests may have a topical nature to them and that you could request, I mean, the one thing I take from this to a certainty, maybe dispute me on this, is that it's possible to request a credit file without requesting a credit score. But your earlier answer suggests that you might see that the same way I do. But what is this? This tells us something about the nature of the topical request, that it could include some things but not others. And so when it can include some things but not others, should that apply to subsections 1 through 5? Or should we just loop subsections 1 through 5 as just file sort of requests? Yeah. So, I think, Your Honor, in the statute provision you just read, credit file means the file, which is defined as all factual information about the consumer. Credit reports, I'm sorry, credit scores are an exclusion. And the reason for that is because they're not information. They are an analysis of information. So, I think consumers are entitled to know all information that someone might sell about them, but how that's going to be scored, whether that's going to be considered creditworthy, whether they meet certain profiles, if you will, that is not information. That is an analysis of information, and that's not included within the file. But that's not what we're talking about in this case. What we're talking about in this case is there's an eviction judgment and a criminal record that comes from a private vendor with different case numbers, different outcomes, criminal findings when there are none. In the case of Mr. Kelly, that's information. So, I hope I didn't misdirect you. I'm not worried about the credit score part of it. Not at all. What I infer from that, though, is that the statute recognizes that there can be a request specifically for a credit file as opposed to other pieces of information like maybe the sources of information or the identification of each person or anything like that. And so, I guess what I'm saying is if the statute is contemplating that there could be a specific request for a credit file, does that also mean that there could be a specific request for the sources of information? Do you see what I'm saying? I think I see the point, Your Honor. And the way we read the provision is that the consumer reporting agency shall, upon a request, provide this checklist of information. And some information, like a credit score, is not included. But after the colon and GA, we have all information, we have sources, we have users, whoever bought the report. I think that's all encompassed in the single request for a file. And, in fact, it defines a file. You're referencing GA1B in terms of the carve-out for credit scores? I'm sorry, Your Honor. I didn't hear the question. You're referencing subsection in 1681G. You're referencing A1B as the carve-out for credit scores? So, Your Honor, I don't have that provision right in front of me, so I don't know that I could answer your question. But maybe I could submit a 28J on that. But I think my understanding of the statute is that credit scores are not part of the file. Yeah. Do we need to address any of this in this case? If the class is limited to the direct request class, so that requests are made over the website, and the website seems from the record to have a single page allowing requests that provides that checking it authorizes the disclosure of a copy of the report and any of the disclosures required by the FCRA, without even the ability of someone making a request on this webpage to specify 1 through 5? So I think the answer to Your Honor's question is no. You don't need to address any of those things if you focus on the group of 16,000 that made their request from RealPages' own website, clicking on words that I think any reasonable person would think is a request for a file, it's a specific request for a file. So we think that group would meet even the district court's, we think, reading of 1681 GA. I think the district court below made a separate error in that area. Part of the decision says that that website allows you to make a choice to either get your report or your file. The court uses the word or, but there is no such choice there. It's just all in one. And I think it says your rental report and all disclosures required by the FCRA. So we think that's direct. It's specific. I don't think the court would need to get into any of those other issues. Can you clarify, does that 16,600 or so include the 2,000 from the lease notebook? Or is it only from the direct request off the website? It could include some of them, but I don't know that there's a perfect overlap. We know that there's a lease notebook that specifies the type of request, but I don't know that that notebook is from the website or from other types of requests. So I don't know the answer to your question. I think there could be some overlap, though. So you're not sure whether there are oral requests in that? Isn't there a subclass? I thought this was a subclass within the direct request class of people who made oral requests? So the subclass that we're looking to certify is the people who made direct documented requests, and we know that there's about 16,600 through the website, and we know that there's another 2,000 that are marked in the lease notebook. What I just don't know is whether there's any degree of overlap, that you could get a notation in the lease notebook even though you also went through the website. No, no, no, that's not the distinction that I'm asking about. Within the 2,534, I think that's the right number, aren't there persons within that subset that made oral requests? And if there are, isn't that problematic in determining predominance? So... Or are you just excluding them? I don't know how you do that, but... Well, let me see if I can answer your Honor's question. So I think within the lease notebook there are people who made oral requests. So we could agree to that. I think the lease notebook specifies the type of request. Therefore, if you have some record which answers what type of information does the consumer want, then we don't need to get into, you know, are they specifically using the word file or report. I do think that there could be some overlap, because if I remember correctly, I think Mr. Kelly both called and went on the website. So... But at the end of the day, we think the way we defined the subclasses through objective criteria and certainly the website would be our focus. 16,600 or so documented direct asking for their file disclosures. We don't think that there was any other option there for them. Can you clarify, just following up on Judge Greenway's question, I had understood from the record that the lease notebook was what accounted for telephone calls and written requests, and that is something separate than the 16,600 or so that were the website requests. Yeah. And both parties are talking about that 16,000 figure, which would seem to, if the 2,000 is separate in addition to, would seem to exclude those that were telephone and in writing. But we're trying to understand what, in terms of at least that class, where having looked at the webpage, you have some different arguments to make, whether that in fact is the subclass or you need to look at something else that may or may not indicate what someone said on the telephone or in a letter. Yeah, yes, Ron. I think I can answer the question. We think that among the folks who went on the website, the 16,600, there could also be some who called, and I don't know that based on the information we have so far. I would assume there are because Mr. Kelly was one of them. However, for purposes of answering your Honor's previous question, does the court need to get into the analysis of direct and what the consumer is asking, we believe that all could be avoided if the court were to focus solely on the website requests. And if somebody made both, so be it, but the class would be just the website, the 16,600 where it's documented through the website. That means you're refining the class to only web-based requests and excluding? Because even among the 16,000, if you can't for certain say there are no oral requests there, isn't that like the essence of the problem as we think about predominance? Am I not thinking about it right? So I think, Your Honor, people could make more than one request, I guess, is the way that I would see it, and they could fall into both categories. But I think a more narrow class of just the website would eliminate the need, in our view, to get into any of the issues that the district court found would predominate. And the error that we point to there is that the district court seemed to think that on the website alone, there was a choice to be made. Are you looking for your file or are you looking for the report? And there wasn't. It was a single request, and I think the request encompassed a file. So we think that part of the decision was erroneous in that a website-only class could be certified without any reference to direct requests or the intent of the consumer or any issue like telephone calls. So the all requests, so the class that you're seeking is a subsection of, or a subset, I should say, of the direct request class and not the all request class, right, because you want to excise oral requests and you only want to deal with web-based requests, right? So if you were in the all requests, you can do that. So do I have that correct? Close, Your Honor. Okay. I think the way I would say it is the direct request class, a subclass, is direct requests directly on the website, directly to a real page. That's one group. The all requests would include everybody, those people on the website, plus those people in the lease notebook, plus those folks who simply got a link because their landlord initiated the process and went on RealPage's website and viewed their report. We don't think that the all requests class is limited in any way. We think the direct request class should be limited to the website. Okay, but if the all direct class includes people who receive oral requests, wouldn't that mean that exactly the content of that request would vary, or at least theoretically should vary from person to person, and then wouldn't that be problematic with regard to predominance? I think now I understand. So that I would agree with. But if the court were to find that the consumers would need to specify that they wanted their file, then there's a real problem with all requests that don't specify that, whether they're oral or in a letter or any other form. So basically if we, under RealPage's reading of the statute, what I'm hearing you say is even spotting them that reading, we would still have a good shot at ascertainability and predominance for the website request subclass. Yes, sir. Okay. Did you propose that more refined definition of the subclass to the district court? Where or is there some place in the record where you indicated that it meant only web-based as opposed to those direct requests that were in the Lease Notebook? So, Your Honor, I think we did. So the all directs, in our view, included everybody in whatever type of method. And I think when we were briefing certification of the motion for reconsideration, we pointed out to the district court in our briefing that it had misread the type of request that could be made on the website, and at least for that population, the website population, there shouldn't be any of the issues about what they intended or whether they visited RealPage directly, and the district court denied that request for reconsideration as well. Is there any place in the record where a different definition of the subclass was proposed? I don't know that that's the case, Your Honor. I think what we argued is that it's within the power of the district court, if it deemed fit, to modify the definition that we proposed, and that we were fine with the modification that focused just on the website for purposes of what we call the direct request class. So if we assume that off of the website, that that's the scope of the class, and the terms of the request on the website cover all disclosures required by the SCRA, why still don't we have here what amounts to a formatting error in that when the report is actually disclosed, it appears from at least Kelly's report that it includes a Fair Credit Reporting Act disclosure page that says, if our report indicates that we requested information about possible criminal records or landlord-tenant court records, contact us at this phone number, and our rental relations team will provide information about our sources to you at JA 43. Given that they make that disclosure to the consumer, why shouldn't we think of this as more of just a sequencing issue? You can infer from that being identified separately from sources of information in terms of the three credit bureaus that that's a different group of sources, and it's an invitation to call if you want that specific information. So, Your Honor, this takes us back to the standing issue. So I think the way I would answer that question is that the record in this case, as I understand it, was that there was never any other option at RealPage during the time period here other than to get a single document called a rental report that if it included public records, it always excluded the source from which these public records went. So I don't think there's any factual record to indicate that even if this was tiered or in multiple steps, they would have ever achieved the goal of disclosing where the information came from. What if some members of the proposed class actually did call for follow-up and did get the information? I mean, doesn't that affect their injury for Article III purposes? So I think that an individualized inquiry that we would have to make of each member, of even the website request class, that would be maybe a little bit harder to ascertain? Well, Your Honor, a couple of answers. First of all, in this case, I don't think there's any evidence that anybody ever called and was told, you know, we got this from LexisNexis. There's just no evidence of that. Secondly, the burden of establishing standing is on the party desiring to invoke the jurisdiction of a federal court. Sure. And so it seems a little tricky to say, you know, maybe we were injured, maybe we weren't. There's no evidence that I wasn't injured is maybe not the way to build a case of injury when you bear the burden. So we didn't inquire what the procedures were and whether there were records kept, and what the evidence indicates is that regardless of the communication that RealPage received, whether it be through a landlord, through a telephone call, through the website, the response was always the same. It was a rental report that excluded the information. And we do not have any record beyond that that any other information is furnished at any time in any format. We also do think that the statute provides that the disclosure requirements, you know, are one at a time. So you could ask for your file, you know, multiple different times, and you get it with information as it is at the time of your request. So I don't know that it would be fruitful to, you know, go down the road of finding out whether someone made a subsequent call a week later, a month later, you know, had a discussion about further information. I think maybe that would be a different transaction for purposes of a request. It also relates to whether there's a request for the source, because at J43 it appears that when the consumer gets their credit report, it has on it a statement that if you want the additional information about the sources of criminal records or landlord-to-tenant records, make a further request, and our relations person will provide that information to you. Given that that's offered and it sort of flags that that source information may not be included on the face of the report, is your argument that it's required, that those vendor sources are required to be put on the face of the report to begin with, or that the listing of public records in lieu of vendors is misleading? So our view would be that the statute provides that at the time of the request, all information is to be disclosed, and that having a statement that says make a subsequent request for some further information is not in compliance with the statute. But also factually, we think that there's nothing in this record to indicate that if anybody were to call to follow up, they would get anything different, because RealPage has said that during the relevant time period, what you get is the rental report, and the rental report always excludes the information. So we think there's a record here that's very straightforward, that everybody, in our view, made a request that's permitted by the statute, and nobody got the sources required by the statute. Let me ask this question. I just want to focus on Mr. Bay for a second. You've said now that we should look at the web-based requests as the focal point of the class, and it sounds like we're collapsing it all into that. And I heard what you just said about oral requests. I'm not sure how we can take judicial notice of all of the oral requests being the same, but let's just put that aside for a moment. If Mr. Bay made an oral request, how does he fit into this class, as you've defined it here this morning, of just web-based requests? Am I right, Mr. Bay's request was via telephone? And I believe I understood what you said this morning to be we're just going to look at web-based requests. We're essentially putting oral to the side. If Mr. Bay is an oral request, how does he fit within this, I won't say newly defined, but refined class? So, Your Honor, if that is what we're talking about exclusively, just the website online requests, and Mr. Bay's request is by telephone, then he would not fit within this group. Only Mr. Kelly would fit within this group. Our argument is broader. We think they both fit because this limitation, in our view, is not the appropriate rating of the statute. So that's why we think they're both proper class representatives. But if we're just talking about direct only, website only, then we know Kelly has that. I don't think there's evidence that Bay has it. We've touched on the problem with report versus file and whether there might be individualized issues that arise if you need to look through the lease notebook. Could you speak to a bit the direct versus indirect and why you think that the clash should be the $2.2 million and cover indirect requests when, in particular, the information about sources and going back to the nature of the injury you allege, that is, the ability to make corrections to inaccuracies, would seem to pertain specifically to the consumer and not to third parties who might receive it.  There is a third party that receives what's called a consumer report under the statute. But in the rental application process when a consumer applied for an apartment, there was an option for the landlord to initiate a request on behalf of the consumer so that the consumer could get a separate copy of their file, in our view. It's the exact same document. So the rental report that the consumer sees is the exact same thing that the landlord sees, as far as we know in this record. It's identical. But when that request is initiated through the landlord, the consumer, and the district court finds this, gets a link that could go to the real pages website and see for themselves. And the reason the consumer could see for themselves is because typically the communication to the landlord is not one that the consumer sees. So you don't know what your landlord sees about you. But if you see the mirror image by going through real pages website, then you have access to your file. In our view, the statute, the way it's drafted and intended, doesn't limit the request in any way. It doesn't say direct request. There are other portions of the statute, like 1681I, that has to do with disputes, where Congress specifically said the consumer must dispute directly to the agency. And there's a good reason for that, because the agency has to know that there's a problem and disputing it to your bank or your landlord may not get to the agency. But if you dispute it directly to the agency, then they'll investigate. But the request doesn't say that. And in our view, the reason why it doesn't say that is the intent of the statute is for consumers to have easy access to all of their information, no matter how they initiate it. And we know that right now in the industry, consumers initiate these requests through proper identification in all manner of forms. And the statute's plain language simply doesn't require a direct request. It's not done. I think there's good policy reasons that the statute doesn't require it to be done. So that's why we think the broader class that would include both Mr. May and Mr. Kelly would. What's reflected about the way the landlords could make that request? Is it as uniform as the website request for consumers to make directly? So we don't know very much about that. We know that it's automated and that the landlords trigger something in their system when they request a rental report, and that gives a notification. I think it's by email to the consumer, and then the consumer could go on the website. That's what the district court finds anyway, that the consumer goes on the website and could see their rental report. I don't know if we know more about that. And there, what's being requested is the report, not the file. Is that right? So what's being requested is that the rental report that went to the landlord also be made available to the consumer. We think the significant part in this case of the testimony is that for the time period in question, the rental report and the file are one and the same thing at RealPage. So even if the consumer were to go to RealPage directly and say, I would like a copy of my complete FCRA file, they would get the same document. The consumer might, but if the landlord is requesting the report only and a copy goes to the consumer, the fact that RealPage decides to give more than is required, if that's our hypothetical, why would that make for a violation vis-a-vis the copy received from a landlord's request? Let me see if I can answer that question, Your Honor. I don't think RealPage is giving more than required. They're giving a copy of the file. It's just that the request is not a direct request to RealPage. It is initiated through the landlord, and the consumer has to go on the website and do something to check their file. But all that is required to be turned over to the landlord, what the landlord is authorized to request, in other words, is the report. That's correct. Not the file. That is correct. So you're pointing to the record here, indicating that RealPage produces more than the report in what it sends out to the landlord and copies to the consumer. So as I understand the statute and practice, Your Honor, the report and the file could be mirror identicals. They could be one and the same thing. And in this case, they have been, and RealPage treated them as the same and did not offer this a la carte system of what do you want. There are other agencies where the file is broader than the report, where you get a lot more information that the landlord never sees or the creditor never sees. We just think in this case, there was no a la carte option. There was no other option. Therefore, any request is tantamount to a request for a file. And the fact that the landlord sees the entire file isn't some violation or a problem. It's just that that's how they do business. Does that require us to read 681G A1 to mean the consumer's complete file? In other words, someone under A can make a request for the file, and you can read the argument that that includes everything, all of this listed from one through six, including the source material. But presumably, someone could call and say or write and say, I just want the sources of information on these pages, or I want the identification of each person that procured my consumer report. If they called and asked for all information in the consumer file at the time of the request under A1, does that mean the report? Or do you agree that that needs to mean solely the report as opposed to the other items in two through five so that they are not superfluous? So the way we read the upon request language is that it's the complete file and all the items, including the sources and the end users. And the alternative to that, Your Honor, is... What does A1A mean? What does the specific request for... So upon request, the information in the file is under A1, but A2 and 3 and 4 have different pieces of information. Is it your position that A1 actually subsumes the other pieces of information? I think, Your Honor, the way it reads is, GA is every consumer reporting agency shall, upon request and subject to proper identification, clearly and accurately disclose to the consumer, and then there's a list of items that must be disclosed. Our view is that upon any request, all of those items need to be disclosed, and that reading the statute to have this, what I've been calling an a la carte approach, that the consumer should say, I want the file, or I want the sources, or I want the end users, or I also like a credit score, if you have it, I'll pay for it, is not the appropriate reading of the statute, because consumers cannot be expected to know that these things even exist. So some CRAs use vendors, others don't. Some sell to a lot of different businesses, others don't. So I don't know how the upon request language could be construed in such a fashion as to assume that the consumers know what's in the file, know where the information is coming from and where it's sold, and therefore they must make those specific requests. We think that any simple request, oral, written, website, should deliver the whole file, and we think that's what's done in the rest of the industry. In fact, we think that's what's done in other divisions of RealPage, which have been subject to a class action settlement, approved as a class action in the settlement context by Judge Padova in the Eastern District of Pennsylvania, and they've changed their practices in that regard. So we think this is the anomalous situation where all the information, the position that they're taking here is the anomalous situation, that you need to make a specific request to get all your information. Typically, we think any request renders all the information. We think that's what the statute requires. That's what Congress intended. That's what industry does, and that affirming the district court in this regard is really going to create serious problems both for consumers and for businesses. What am I going to request? How am I going to make it available for a request? How am I going to deliver it? How do we even know whether I should ask for vendors? I don't know if they use them, so forth. So we think the better reading and the appropriate reading is the simple one. Any type of request would do. Can you clarify just one thing on the record? I was asking about the SCRA disclosure form that accompanied Mr. Kelly's report. Yes, Judge Crouch. In the joint appendix, there doesn't seem to be such a disclosure form for Mr. Bain. Was it just not included, or is there something different with regard to his request? I think, Your Honor, that's just the consequence of real litigation. Sometimes you have a complete copy of documents, and sometimes you don't. There's nothing for me to indicate that it would not have been available to Mr. Bain. I think as a practice, they give both a report and a disclosure. We just don't have it in this case. Just to follow up on that, the correspondence that Judge Crouch is referencing at JA-43, it's your representation that every member of the subclass as well as the broader class would have received a like-kind correspondence? I think so, Your Honor. With the same paragraph that Judge Crouch previously asked questions about, is if you want landlord-tenant records or criminal records, call us. That's what we understand to be the practice for everyone, Your Honor. Okay. Do you want to briefly address the personal jurisdiction issue? Certainly. We do think that we brought a federal claim in federal court as a class action. We think we belong here for a nationwide class action. Bristol-Myers-Swibb, in our view, does not alter that reality for Rule 23 because the sovereign at issue here is the power of the federal court, and I think the federal courts do have the power to interpret federal statutes and to do so on a nationwide basis. We think the only circuit up to the point of briefing anyhow to have addressed that issue, the Seventh Circuit was correct within the district court below and some other district courts here in the Eastern District were correct, and that we don't see this as a problem in federal court. If the case is to not remain in federal court because of subject matter jurisdiction and go to state court, whether in Pennsylvania or California, where Kelly and Bay are from, I'm not sure exactly how that would work, but that could come up there, but not here in federal court. So it came up in that context for the Seventh Circuit, also at the Fifth and Ninth, where certification is granted and it's on appeal. Where we've got a 23-F, we've taken interlocutory appeal as to particular issues around certification. Is the question of personal jurisdiction of absent class members even properly before us? We would take the position that it's not. Rule 23-F is limited to the issues taken, and that issue was not taken. I think that Article 3 in subject matter jurisdiction is always an issue, and the court could and should address that issue, given that Rio Page has raised it, and the clerk asked us and we provided supplemental briefing, but we think the Bristol-Myers squib is an issue for another day and should not be addressed here. All right, thank you. We'll see you on revote. Thank you. Let me get my mask back on. Give me a second. Good morning. Good morning. Thank you, Your Honors. Misha Tseytlin for RP Onsite. Now, there was obviously a lot of ground covered this morning. I had intended to start with the Article 3 standing issue, but there were a couple of specific inquiries that relate to the record that I would like to clarify for the court.  This is the class that they sought to certify. This is the smaller class, the direct request class. You can see that on JA-6. It clearly covers all requests, whether through the website, by email, by phone. That's the district judge's opinion, and then the district judge cites the ECF entry for their request. I think I heard counsel today attempt to orally amend his smaller class to exclude one of his two plaintiffs. That's a bit unusual, but I do think that the direct request class did have all these folks that called in, that emailed in, and for those individuals, certainly there would have to be a mini-trial for each one to see exactly what they were requesting. If they just wanted a narrow category or the broader category, whether they wanted the sources and things of that sort. No mini-trial for the website request, though, right? That's correct, although I think it's clear that those people just don't have a claim because the website itself makes you select where you apply and it says report. Now, they cite additional language from the website,  because it was only submitted in the improper reconsideration motion, but if your honors do want to consider that full website language, which was not timely submitted, we would respectfully say that the all required disclosures language there is merely belt suspenders of federal law, but it's to say if there was a particular request that was made and as a result of that request there are required disclosures, that would be part of it. Where is there even the opportunity to make particular disclosures on that page? Sorry, your honor? Where is there any opportunity for a consumer to specify disclosures other than just the whole kit and caboodle on that webpage? That webpage is made for the opportunity to request rental reports, which are consumer reports. That webpage is not made for the opportunity to request consumer files or some of the other categories in order to get that kind of request. You've got to call us or you've got to email us. The webpage is set up for the convenience of the consumers to get what consumers usually want. Usually a consumer who has a lease application denied, they're not interested in knowing what's in the full universe of their consumer file, which might have a bunch of information that the particular apartment building never requested or never received. They want to know generally, not all everybody, but most people want to know, what did the leasing company see about me that caused them perhaps to deny my application so I could correct that. So that's what the website is doing. I find that a bit surprising that you think that the website, which doesn't, perhaps you could indicate where it informs the consumer that they're getting only a part of the file and that they have to make a telephone call to make requests for the remainder of the file beyond the report itself. The website, and again, the full text of the website is only as part of motion for consideration. If you want to consider it, that's at record 7128, and it says that by clicking submit below, the consumer consents to on-site making a copy of its report and any disclosures required by the FCRA available to them. It doesn't say file. The website... Any disclosures required by the FCRA, which is, I think, all we're talking about for purposes of this suit, right? That's everything under 1681G. The disclosures required... There's no disclosure required under the FCRA without a request for a file. As Your Honor noted in going through the various subsections of GA, there's a lot of different categories that could be asked for, and there's no disclosure required unless someone asks for the various subcategories. And the broadest request, of course, is to ask for a credit file, which is everything that the credit reporting agency has on you. And I think that it is not a fair way to read the website, which specifically references a report and makes you select which property the report is for, that someone who's clicking on that would think they're going to get the full amount of things that RP Onsite has on them. That would be an unusual thing for someone to receive, to receive the full category rather than what a consumer would expect to receive, I would assume, which is the consumer report that a particular rental property received, so they can figure out, hey, why did my lease application get denied? Now, just a little... I'm sorry. I want to make sure that I'm understanding your position correctly, that by clicking a button that indicates that a copy of the report and any of the disclosures required by the FCRA will be made available, by clicking that, that the consumer should understand that they're only receiving a copy of the report and not any of the disclosures required by the FCRA other than the report. Is that your position? If I could refine that, Your Honor, and explain. We think that a disclosure of a consumer file is not required by the FCRA absent a specific request for a file and a production of the consumer's ID. That's what the statute says. We're discussing here what the consumer requests when they click here. When they make this request, is this fairly read as a request for all information under 1681G? Our position is that it is not. It says any disclosures that are required. There's no requirement to produce something unless that thing is specifically requested, and the only thing that's referenced here is report. There's no requirement to produce a report without a request either, but that's what this web page provides the opportunity to do, right? To make a request. It does provide the opportunity to make a request, and again, I don't want to belabor the point. Our argument is that it says report. It doesn't say file. If the consumer wants a file, they have to request a file. A file is an unusual thing to request. Obviously, the website is not a statute. Maybe it was not as awfully drafted as it could have been. Can I clarify another point? In responding to the scope of the direct request subclass, you seem to indicate that it would be an amendment to limit that to what's requested over the web page and that, as presented to the district court, that included separately the lease notebook with verbal and written requests. But the J6 that you pointed us to indicates the direct request class is a tenant who requested a rental report to be sent or cost to be sent to them by RealPage through its on-site operation. And how would the on-site operation, that is the website, is there an on-site operation that is something other than the web page? Well, it's very important that I clarify this. This language there is a function of their misstating our corporate structure. RealPage is not involved in any of this at all. RP on-site is the only company involved here. What they're saying is RealPage through its on-site operation is they're misstating our corporate structure. The RP on-site, when they call us to request, that's an RP on-site person calling us. When they email us, that's an RP on-site person that they're emailing. That language that you read, RealPage through its on-site operations, that's not RealPage's website. That's just them misstating our corporate structure. I want to be clear, it's very important, and if that wasn't clear, I'm going to repeat again. RP on-site includes the website, includes the emails, includes the phone calls. RealPage is just misidentified as a part of this case. That may well have been explained to you to this report elsewhere, but in the course of clarifying that or correcting the understanding of the corporate structure, was it presented to the district court that, as described here, that is a report that was sent by RealPage through its on-site operation, indicated the website request? I believe that, I mean, my friend mentioned something in the motion for reconsideration, which the court ruled was improper, but my understanding is, at least until the motion for reconsideration, or maybe until oral argument today, the direct request class has always included both the website's requests and the phone call and email requests, and that the notion that it would be further limited to just the websites is either something that was mentioned in the improper motion for consideration or for the first time today in an oral argument. You indicated that the subclass is also described as a 16,000 figure. Do you agree that the 2300 is separate from that? It's in addition to that? The 2300 is a little bit of a confusing distraction. The lease notebook option is only triggered when a particular landlord, a customer of ours, triggers the lease notebook, and that may include, for those people, the website requests. It may include phone call requests, and if the landlord doesn't trigger the lease notebook option, it wouldn't even appear in the lease notebook, and the direct request class certainly covers anyone who called in or emailed and for whom the lease notebook option had not been triggered. As long as they documented their phone call or their email, they would be part of the direct request class. So the lease notebook is a little bit of a confounding factor because it's just an optionality that only a subset of the landlords activates. Can I ask you a question about standing? Sorry, can I just clarify? I still don't understand. Is the 2300 in addition to or part of the 16,659? Partly in addition, partly and partly as part of, because those people are the ones for whom the landlord has chosen to activate that particular feature. So if the landlord has both activated and made a website request, they would fall into the 2000. If the landlord hadn't activated the lease notebook feature, they wouldn't be part of that at all regardless of how they submitted the request. So you're saying that some of that 2300 is in the 16,000, some isn't, probably. We just don't know where that dividing line is. Yeah, yeah. So the lease notebook causes confusion. It doesn't elucidate anything about any of the classes because of the bespoke nature of it. On standing? Let me just ask you this question. Let's just say that there's no Article III standing here. Could the plaintiffs in some form, might be different, based on personal jurisdiction concepts, litigate this case in state court? Well, the issue would be whether the state courts follow the U.S. Supreme Court's standing jurisdiction. And let's just say they don't. Because they don't all, right? Let me revise the question. Could plaintiffs litigate this case in a state court that doesn't track perfectly the vicissitudes of Article III standing jurisprudence? Certainly that issue hasn't been briefed here, but we would certainly take the position that at minimum, let's say my friend mentioned California. That's perhaps a court that some plaintiffs are going to. At minimum, they can litigate nationwide class actions under Bristol-Myers. But that's what I thought you'd say. Makes sense to me. But I guess my question is, it's just a very strange gloss on constitutional text, which all the standing emanates from what's a case or controversy, right? To say, no, no, no, no, no. You don't have a case or controversy. Absolutely not. No Article III standing. Go litigate your case in a state court. You have a case there. It's just a strange and unusual double meaning to the word case. And I know we get there based on the Lujan and the Valley Forge formulation, the standing, the spoke, you know, and everybody else. All these decisions are clarifying. But if we trace it back to constitutional text, it says case. And so it's very weird to recognize the possibility that something that would not be a case in federal court could be litigated in state court as a case. Well, you are obviously, you know, Judge Sutton's famous book about 50 Imperfect Solutions, you know, that each state can define the scope of its own court's jurisdiction within the limits of the Due Process Clause or any other U.S. constitutional law. But if we look to state law to define the common law at the time of Article III, if we look to that to define what would be a case, it's just strange at one level to say, go litigate in state court, you have a case there, but you don't have a case in federal court. Because as we do the prong one of the Lujan analysis, you don't have an injury in fact. So I don't mean to this answer to be evasive, but the nature of subject matter jurisdiction is all the federal courts can say is you can't come here. When the case goes to whatever state court it goes to, there may be state constitutional arguments, there may be federal constitutional arguments that are raised. But this is not in the nature of some sort of... If nothing else, it's a strange quirk. It would just be a weird quirk to kick a case out of federal court only to litigate that because it wasn't a case and litigate it only in state court. Let me ask you one other follow-up about Article III standing. And I'll give you a preview of where I'm going. There's this notion in standing that we don't let people litigate generalized grievances. That just kind of pervades the standing jurisprudence. But we also have a Supreme Court case that says, oh, if you sue under the Freedom of Information Act for public information, information that everyone's entitled to, disclosure to one and disclosure to all under FOIA, you have, and that request is denied to you, you're standing. But in this case, when a person makes a more particularized request for their individual file, what we're saying is no. That more particularized request, there's no standing for. But had you made a generalized request for a matter of public importance under FOIA, almost in the general grievance category, then we have a Supreme Court case that says they're standing. So it strikes me as a little bit counterintuitive to permit disclosure claims for public information under Article III, but disallow disclosure claims for personal information under Article III. What do you say? So I think that's just a function of when the Supreme Court decided various cases. Certainly, those open records cases were decided before Spokio and then TransUnion. So those cases... Haven't been overruled, though, right? Right. Otherwise, FOIA would be basically a useless statute because we'd say, what's your harm for not getting the info? And that would be very strange. Right. And I think that the reliance interest there might cause the U.S. Supreme Court not to want to overrule those cases for those reasons. It may be that if those cases had been considered as an initial matter under the current doctrine, it would have come out differently. But we do have stare decisis. So in a case that involved a Sunshine Act kind of situation, those cases are binding. But this is not a Sunshine Act case. But it's actually more particularized than a Sunshine Act violation. And particularity is a really, really, really good attribute to have to prove Article III standing. It's one of the buzzwords in Wuhan. But with regard to particularity, your honors have an FCRA case recently from the U.S. Supreme Court. It tells your honor how to do FCRA claims, notwithstanding whether that fits nicely with the U.S. Supreme Court's doctrine in a different area. And the way to answer the question that you had before, as I read the Supreme Court, Ramirez's decision, is that you've really got two paths here to establish standing. One is you can do a historical analog. And I think your honor had a good conflict with my friend, which I don't have much to add to, about why they don't have a historical analog. And two, I think if you can show some real downstream consequences to you, I think you might not need a historical analog, or at least showing for a historical analog is weaker. And so here, I think it's very clear from the record that there was no downstream consequences from us not giving them the vendor information. So even if that's true, they could still prevail if they show a sufficient historical analog. And I think that when we look at historical analog, we should also look at other cases in which the Supreme Court has permitted disclosure claims. And some of those are FOIA cases. Certainly, it's not historical in the sense of ancient history. FOIA's only been with us since 1968. But it's at least jurisprudence. Well, in TransUnion, they cited those cases in an FCRA-disclosed situation, and they walked right through them. So I don't think that those cases can save an FCRA claim based upon an information injury where you don't get some kind of information that has no consequence to you. I think TransUnion is on all fours of that. But let me just put this. Is there any way to just, as a matter of logic, not following precedent, but just logic, continuity, say that a plaintiff has informational standing for denial of a FOIA request, just across the board, any request, any time, but does not have standing for a request about their particular financial or credit history? Just as a matter of logic. I'm not saying what precedent tells us. And I suppose you're not going to just let me read TransUnion directly to you and say that's logic? What? Maybe you can answer the question with that, right? But I guess I'm saying what I hear your response to mean is we have to accept the answer on TransUnion. Yes. So whether or not there can be greater harmony that I'm kind of asking for, what I think your response is, is just accept the answer on TransUnion. Right. And I think my – I'm not trying to be glib about it. I think, you know, just, I mean, the Supreme Court recognizes this difficulty. And it's a conclusory sentence, but I think the way that you bridged that gap is not indecisive. Those cases exist, you know, and so, you know, the U.S. Supreme Court, you know, has said Hath-Akins, you know, and so it wasn't going to overrule it in TransUnion. So it said those involved in this category, but here we – this case does not involve a public disclosure law. And that's what it said. That was the entirety of the distinction the Supreme Court gave. I'm not going to stand up here and say that it's logically satisfying, but I think, you know, if one scours the U.S. reports, this kind of thing happens not too unusually where you have an older line of cases that conflicts with the way that the U.S. Supreme Court has developed the area of law. And the U.S. Supreme Court sometimes, two, three steps down the line, takes out that old doctrine and says, based on developments in the adjacent area of law, we're going to take out that doctrine. And sometimes they say, no, like, we're going to let that stand. You know, something like that is in Humphrey's Executor where the U.S. Supreme Court has come to a much more fulsome understanding of executive authority, and there's a lot of arguments of how can that be squared with Humphrey's Executor and these multi-member bodies that are not subject to presidential removal, and the Supreme Court at least has so far said, well, that's precedent from a long time ago, and that's not going to be overruled. Maybe someday it will be, but I don't think it's unusual to have that kind of circumstance in the real life of the Supreme Court. You say there's no downstream harm. We've discussed in Cortez and elsewhere that the harms that Congress was seeking to address in the statute included the lack of access to information and the difficulty correcting inaccurate information. Why isn't the omission of the vendor information where the source of error or at least missing information that would have enabled the name plaintiffs to correct the error lies? Why wouldn't that make it more difficult to correct that inaccurate information? Why isn't that a downstream harm resulting in a negative report that had negative consequences for their housing opportunities? On the facts of this case, the vendors played no role in any problem that they suffered. The information came from the court, and then it was mismatched to them by our proprietary algorithm. The problem was either at the court or with our algorithm, and they have separate individual claims currently pending before the district court saying that our algorithm messed it up. Fair enough. We'll litigate those. The vendors on the facts of this case are nothing more than couriers. They go to the courthouse. They get information. They give it to us. If we had a different plaintiff, a different circumstance, that there was factual showing that the courier had messed up, and the courier had all this information, and they wrote it down incorrectly from the court, and there was a concern by the individual that this courier was also working with other companies and was going to spread that around. If on the facts of that sort of case, there could be Article III standing, but it is not the facts of this case. The facts of this case is the plaintiffs say, we don't know who got this information. They had the information for 10 months. They did nothing with it. There's no suggestion in the record that the couriers did anything wrong. The real problem was, according to them, and there appeared to be a problem, was the proprietary algorithm that we have, and that's mentioned on JA-60, did not properly match the court record. Just to say that if they had the accurate information from the vendor, that would have provided them the evidence they needed to persuade your client to correct the record. The vendor, again, is just the courier. The situation occurred because of the relationship between the court record and our algorithm. The only thing that the vendor did was bring the court record to us, so that's why when they got the vendor information, they didn't do anything with it, because the vendor has nothing to do with the problem that they are identifying. But that doesn't answer the question. This is a question, is there downstream harm based on these facts? So the inability to correct an obvious error is impeded by the lack of information. Now, you can explain it. It was the algorithm. It was the vendor, whatever, but in asking about harm, those two factors, you had nothing to do with it. It was the vendor. Don't explain the question, or don't answer the question, of whether there was downstream harm. So the only question is, is what occurred here, the inability to know the information and therefore correct it, a cognizable downstream harm? And our respectful submission is that the identity of the vendor would have been irrelevant to any effort to correct this. All the vendor is is a courier. They have not explained what they would have done differently in the real world, what the downstream consequences would be if they had the vendor information. And your honors don't need to speculate. We gave them the information in discovery. It was ten months between their depositions. They didn't do anything with the information, because the information as a practical matter on the facts of this case is irrelevant to these two plaintiffs. Let's just tease out. If the information, like some of it in TransUnion, is just maybe, I don't know, this might be too strong an expression or characterization, but inherently harmful, like associating a person with being a potential terrorist or something along those lines, then you could say, hey, that information in itself is just a problem for me. It's misinformation. It's confusion. It's wrong. It's things like this. Here, it strikes me that there might be a lack of information that in some instances might actually be useful to people. They say, I would like to call the courier, because maybe the courier could give me a tip as to where they got this or the courier could give me some other information. In other instances, it might not be at all useful to anyone. So there might be some cases where you could say, yeah, I called the courier and I learned some great stuff. I called the vendor. I learned some great stuff and it helped me clear it up. In other instances, it wouldn't be. And so it's hard, though, at one level to say there's two possibilities. Sometimes it might be useful. Sometimes it might not be. And then for us to say, oh, we'll make that decision at a higher junction point. We'll make that decision before you can actually follow up to find out if it would be useful. Those may be rare instances. Or if it wouldn't be useful, maybe, as you posit, most instances. And so the possibility that the information could be useful to someone, isn't the loss of information that could be useful a downstream consequence that's at least sufficiently tangible to a person? With respect, I think you split things up like that. For the people that it is useful for, they have article 3 standing. For the people that it is not useful for, they have no article 3 standing. That's damages, not standing. How are you distinguishing between the two? For someone for whom the identity of the courier is wholly irrelevant, they have suffered no cognizable injury. And obviously this is not generally going to be decided at the pleading stage. You get discovery. What good would knowing the courier information be for you? And if you're saying it has no value to me, it would not change anything in the real world. For me in particular, me plaintiff, it would change nothing. I would act the same way in world 1 with the information, world 2 without the information. That is the paradigmatic case of no downstream consequences under transient. So you're saying there should be a different class. The class should be only people who can assert, if I had this information, I could do something with it to my benefit. But that's requiring us to take a couple of steps that the law doesn't require us to, doesn't it? Well, in terms of a class, you need to have a representative, a class representative, who has suffered, who has actual injury. And so if you don't have an individual injury asserted here is, I don't have information for which I can repair an arguable harm. Whether we talk about reputational harm or we characterize the potential for harm in many different ways, but that's what the assertion is. It sounds like you want us to take two steps further and say, hey, you've got to prove that this information would be useful. I mean, I thought the assertion was sufficient to just say, I need the information to make a determination whether it's useful. I think that's too low a burden, but even if you're going to adopt that standard, I think they haven't even met that burden. You know, if you take a look at their letter response and their briefs, they only have three record citations for their claim that there were downstream consequences. One record citation is just the deposition where Mr. Bages talks about his back-and-forth with RP onsite. The other two citations are to each of their respective declarations that just say in a conclusory manner, I wanted this information. Kelly's declaration in paragraphs 5 and 6 and 8 and 9 indicates that he couldn't locate the underlying criminal records because the case numbers in the rental report didn't match publicly available records, and that caused confusion, unnecessary distress, and inability with various approaches to your client to get it corrected. If Mr. Kelly had the intermediary source information, the direct source information from which your client was drawing those records and could see that that source information had a different number than your client's information, that would put him in a much stronger position to get that corrected and changed. He made multiple requests and just was told that they were not going to make the change, right? I don't want to push back too hard, Your Honor. It's not that heavy a burden. If he had said in his deposition, he had said, you know, that's the problem I had. If I had been given that vendor information, I had this confusion, and I would have called them and maybe they would have helped clear things up. We would think that's enough for standing. He doesn't close that loop, and in fact when we asked him at the deposition, he couldn't explain what he would have done with the information. He didn't call them after we gave him the information, but certainly the hypothetical that you articulated, which is he wanted the vendor information so he could call the vendor to find out, you know, where this error occurred. We would think that that would be enough to cross the barrier for standing. This is a jurisdictional inquiry. We tried to present to this court the best we could. Inclusion, you know, sounds like we're going to get sued in state court if we win here. So we're not kind of jumping up and down here, but we think that the best reading of the record under a trans-union is they didn't do enough. Even if they had done as much as you just said, Your Honor, that would have been sufficient. So just to try to extrapolate from what you're saying into kind of maybe a coherent theory of informational standing, I guess what you're saying is if a statute imposes a disclosure obligation on an entity and the entity doesn't comply with that disclosure obligation, that's not enough to have standing. But if the recipient, if the requester then says that information would have been valuable to me for the following reasons, then with the addition, that addendum of the requester, whose burden it is to invoke Article III jurisdiction, would say, yes, this is how I would have used this information had I got it, then you say there is Article III standing. That's right, Your Honor. And what's missing here is that what I'm calling addendum. Yeah, it's not a heavy addendum for them. It's fairly logical if it was true. Obviously, they'd have to actually believe it. But if there is that addendum, the one problem with that addendum for at least plaintiff class action shops in this space is that would have to be true for – that's a bigger problem in terms of ascertainability, in terms of predominance, maybe in terms of commonality and stuff like that. You mean even numerosity given how not useful this information is. And so what happens is you maybe would say, yeah, it could possibly happen. There could be people with that sort of standing if they allege the addendum, but it's going to make class action litigation in this space much harder. That's exactly right, and that's why the FCRA provides statutory damages to allow incentives for individuals to bring – Absent of class action. And so, you know, as I said, they're continuing to present – to move forward with certain individual claims with regard to this transaction or occurrence below. And so they would – certainly there could not be a class under that kind of inquiry because it would – I think every single Rule 23 factor would fail, but they could – if they did have the addendum that Your Honor mentioned or if Your Honors reads that addendum into the declaration, then Mr. Kelly would have standing in the case. I guess, though, I mean if there's any support in any case that would say yes, on the informational standing inquiry we want a substantive addendum. And when I say substantive, it means a statement that I would find this information useful and I would act on it. That's how I read downstream consequences from the U.S. Supreme Court in TransUnion. They weren't trying to – I don't think the court was trying to build a high barrier, but I think they emphasized there was no downstream consequences. And in the Fourth Circuit's DERA case, you know, again, no downstream consequences. So what you're saying is the precedent exists kind of in the negative, which would be if a person doesn't have any downstream consequences and they would never use the information, we know they don't have articles of restanding. So to take yourself out of that set of people, you would need the addendum. Am I recapitulating your position correctly? That's exactly right, Your Honor, and that does respect Congress in a way that the site may be in TransUnion was concerned about because it does. I'm sorry, but doesn't that have it somewhat backwards in the sense that you have the information so you know whether you can use it or not? You're saying that before someone has it, they're complaining about the failure to disclose information that they don't have standing unless they can make the case that the information that they didn't have would have been useful to them at the time. Isn't there an issue that from the outset, when they don't have the information, that had they received it and known what it was, they then could have used it? And why doesn't the facts that we have here, I mean, when you piece those facts together, isn't it obvious in retrospect how it would have been used? How would standing require someone to anticipate all of that in advance and be able to make a case about how information that they didn't have would be useful to them? That's the reason Congress wanted it disclosed, isn't it? What TransUnion carves out is situations where plaintiffs try to generate a lawsuit or a class based on a technical error that doesn't actually matter to them. That if they had gotten the information, there's no way they would have done anything with it. They didn't actually want the information. What they want is they want to bring a lawsuit so they can make some money. And so if your Honor reads the declaration here in a different way, that they actually wanted this vendor information for some real purpose, that they would have called the vendor and they would have done something if we had gotten to them, then we should lose outstanding. That's not how I read the declaration. So I think it ultimately boils down to how your Honor does read the declaration. Like I said, we're not jumping up and down about this. We could fight about these issues in state court or in federal court. We think the best reading of the case law and of that declaration is they haven't done enough. But if your Honor thinks they have done enough, that you want to extrapolate from the declaration to that conclusion, then your Honor should find Article 3 standing at least with regard to one of the plaintiffs and then move on to the merits. And I will just note, and I think it's just, I want to, for when your Honors are writing this opinion, regardless of how you write it, the district court has, in this case, already granted summary judgment in our favor on this claim, on a different issue that we haven't discussed here this morning, which is that the district court concluded that at least it wasn't willful and it was a plausible interpretation of the statute that these vendors were not sources at all. And so I would just, I'm sure your Honors are aware of that, but I wouldn't want anything that this court would say in its opinion to countermand that decision. Because what would happen if your Honors were to reverse here is the summary judgment would be entered, it has been entered, and then the whole case would come back up. It's clear that's partial summary judgment. The negligence claim is still there. It's still active. You're not making an argument that it's moot. The only reason it's not moot, your Honors, is because they have the right to appeal. We think they've abandoned negligence claim. They don't talk about it in any of their papers. The negligence claim actually requires the showing of harm. They're not going to be able to show harm here, any dollars and cents injuries. So I think... They've waived it on their 23F appeal? Yes. There's nothing in their 23F papers. They made one stray reference. But that's not what we took interlocutory appeal on. We're not addressing, and they aren't... There's no need for them to brief the question of willful versus negligent, right? Fair enough, Your Honor. Opposition is in the district court. They've abandoned the negligence claim. But that can be sorted out in the district court. The reason that this is not... This appeal is not moot is because, even if we're right about their abandonment of the negligence claim, is because they still have the right to appeal that summary judgment decision on final judgment. And so I just wanted to plant that flag so that nothing that this court said would prejudice the district court's decision that these are not sources at all. They're just couriers. Can I just follow up on this kind of black box kind of thinking on informational standing? The notion is this. A consumer doesn't know what this information is because they haven't been provided that information. And so at one level, we could say certainly if they would say categorically, whatever is behind the curtain, I would use. That's kind of unrealistic because people don't like to make kind of unconditional promises based on the unknown. A little strange. And so I think the next option would be whatever is behind the curtain would be useful to me in deciding what my next steps should be. And one of my next steps might be to go and contact vendors and sources and all these other things. And one of them might not be. But right now, I can't tell. But I would like to know because there's a potential that something behind that would be useful to me. I'm going to kind of think of like, you know, college probability. You know, if you sit there and say there's a 10% chance it would be useful and a 90% chance it wouldn't be useful. You say, what's the value behind the curtain? It's 0.1. You know, something like that. Yeah, that's right. But it would still have some value just accounting for the possibility that it could be useful. I could see how that kind of inquiry would be tricky in a situation where the information you're getting could be all kinds of things. But here, the only information we're talking about is just the name of the vendor. And our respectful submission is that the record before your honors is that regardless of what name would have come out, whether it was LexisNexis or something else, the record shows that regardless of what that name was, they wouldn't have done anything. And the reason we know that is because they said it in their depositions. And we know it even more clearly because they got the information and didn't do anything for 10 months. It might be that other individuals might have. So is that more attack on kind of the class reps than it is, I mean, maybe they have new class reps, or is that kind of just class action generally? Our standing argument here is entirely on the two class plaintiffs. This court's case law does not require absent class members to show standing at this class search stage. But these two plaintiffs have to, and I guess what you're saying is, well, it might have had value to some people. We've lifted the curtain in this case, and we've seen what they've done with it, and it's your position that they've done nothing. That's exactly right. Now, you know, I understand there's one reading in one of the declarations that could suggest something. To the contrary, we don't read it that way. But that's the decision that I think, in our construct, that's the decision before this court, is have they shown, since it is their burden, they would have done something with this information if we had given it to them where they claimed they were entitled to it. Now, you say you're not jumping up and down on this Article III standing issue, and I get it because you say that you're probably still going to have to litigate this case in state court, but your odds of being subject to a nationwide class in state court is a little trickier. So it is winning Article III standing isn't just we'll see you down the street sort of thing. It's a we'll see you and considerably less people in the putative class down the street. That's absolutely right. On the other hand, we do have a summary judgment ruling in our favor on whether we did anything illegal, or at least on the Wolfson's claim, which is the big dollar claim, which is obviously interlocutory, so that weighs in the other direction. So we certainly think we win Article III standing, but, you know, like I said, we're not jumping up and down. We're making our best argument that we can based on our reading of the law and the record. To be clear, are you saying that in terms of standing of a plaintiff who receives this information in the course of litigation, that if they don't then do something with it, that they can't show they would have used it and therefore can't show injury? No, Your Honor. Your Honor, we're saying something more contextual that that is a data point. I mean, this isn't getting them getting the information 10 years later. This is pretty close in time to when the problem occurred. But they received it after the adverse housing events, right? Well, the adverse housing event happened before they made the calls. That's what caused them to make the calls anyways. And then, you know, one of them ended up in the housing project, you know, the house anyways. So I certainly agree that there could be a circumstance where someone says, that information would have been useful to me five years ago, but it's no longer useful to me now. That's not why I called. But we asked them, what would you have done if you had gotten it at the time? And they couldn't answer that question either. So I think it's a confluence of the evidence that it is their burden that that's our submission. What relevance, if any, does it have that someone doesn't take action if they receive information in the course of litigation? It tends to suggest that the information was irrelevant to them because nothing materially has changed. If they really are concerned that there's something in their credit file that is wrong or something in their court record is wrong, you would think that they would be concerned about it today like they would have been concerned about it two years ago. Now there could be changed circumstances. They could say, you know, my financial condition has materially changed such that I'm not interested anymore. You know, they could have given that answer. They said, well, you could imagine someone giving that answer saying, I really cared about it then because I had, you know, a car loan also I was going to apply. I was worried the same situation was going to come up. But now I've got my car, I've got my house, you know, that doesn't bother me. So that wasn't the answer they gave. I think a fair reading of the deposition is they didn't know what they were, they had no idea what they would have done with this stuff. They didn't have any particular reason for it. It's really just to generate a lawsuit. All right. Can I ask one question? I just want to confirm that if a class were limited to the online direct request class, and I understand there's a lot of ifs there, but were that the case, you at that point would not contest ascertainability? Is that right? I mean, predominance as well, I assume. We would think that that class would fail because every request through the website is for a credit report, and so it falls outside of the obligation here, as we discussed earlier. I know there was some skepticism on the bench, but that's our primary submission on the website. And if we interpret it to be a request for all information under 1681G, under those circumstances, do you agree it would then satisfy ascertainability and predominance? We would have different arguments about that in that circumstance, yes. We would have merits arguments against that, but it would not be a class problem in that sort of circumstance. It would not be a Rule 23 problem. It would be a no liability issue because we think that the predominance of ascertainability problems come from the fact that their defined, narrower class involves all the phone calls and the emails. If they're now amending the class on the fly, then some of those other problems wouldn't be extant in that circumstance. So defined as a web-based class and a request that included all of the items under 1681G, you agree there's not any shortcoming as to, or you agree that both ascertainability and predominance would be satisfied? Yes. On the caveat that a court were to find that that is exact, that the website requests the full file. The hypothetical. Yes. And so I just want to make sure that nothing is quoted back against this letter. Yes. Thank you. Thank you, Your Honor. Thank you very much. And we'll have rebuttal. How much time did you reserve again? Four minutes? Your Honor, I reserved four minutes and I'm going to try to stick to that. I'll gladly answer the court's questions. We'll try to keep you to it, too. There are a couple of points. There are a lot of points that came up during counsel's argument that I disagree with, but I do want to focus on two in particular. At some point he said Mr. Kelly did not do anything with information after we gave it to him. That's the whole point. They never gave it to him. The fact that he happened to find counsel who knows about prior lawsuits involving the other subsidiary of this publicly recognized consumer reporting agency cannot be the standing measure, either for individuals or classes. The whole idea of not getting information to which you're entitled is the injury. That's what this court has said in Nickelodeon. I do not think Ramirez says otherwise. If a person later disavows that they had any, that that information had any utility to them, that kind of is a disclaimer of the injury, right? Versus, oh, no, I actually, that meant nothing to me. We think it would have meant nothing to me back then. That's a decently strong disclaimer, right? I mean, it's not contemporaneous when they were denied the information after litigation, but it's backward looking enough of a disclaimer that suggests maybe there is no injury, concrete injury. So certainly that's not helpful to damages, but we don't think it would affect a federal court's jurisdiction in Article III standing, because I think the district court got it exactly right on page 10 of its decision, J.A. 10, when it said the issue is one of choice. The consumer gets this information, and then they decide what to do with it, if to do anything with it, or you just stay pat. But you cannot make that decision unless you know that there is information. So that's the injury in this case. The other comment that I'd like to make is on counsel's description of their website and what he thinks it means when someone clicks on that website that they only want what the landlord got and nothing more. That's precisely the practical problem in this case of following the district court's rationale. If the channels by which consumers could request information are driven as they are by consumer reporting agencies, and their websites say one thing and mean another, or you have to call us for that, but we're not going to keep any record of what you actually said during the call and what you requested, there is no way of supervising the statute of whether a request is made and information is delivered. We think our reading, the plain text reading that any request will do, is the appropriate reading. If the court disagrees with us, we would respectfully request that you explain what consumers and credit agencies need to do in this regard. There is absolutely no guidance for consumers to say, I do want the sources. If there are any, I don't know how you're going to find out that they're private sources. I do want the end users. I do want all the information about me, not just some of it. And certainly industry, including RealPage, on its website and on the records in this case, doesn't make that option available. So how could consumers make these elections when they don't even know that they exist? Most consumers have no idea that the Fair Credit Reporting Act does not define credit report. That's what everybody thinks it is. It doesn't define it. It defines consumer report. Nobody knows what a screening report is or a background report or anything of the sort. They just want information about themselves. And in our view, this court should make it clear that any request will do. Can you address the issue of the definition of the subclass? I'm sorry, Your Honor. I didn't hear that. The definition of the subclass, that is the way it reads with a distinction made between the onsite and RealPage makes it sound like that is limited on its face to web-based requests. But if, in fact, it was just a sort of misunderstanding about the corporate structure, then that same definition could be read to include not just web-based requests, but any other requests coming in different ways. So I think, Your Honor, the reading about it coming from onsite definitely encompasses every single request on the onsite.com website. We don't think we made a mistake about the corporate structure. Every witness in this case has worked for RealPage. They have a single facility for all their subsidiaries. They share employees. It's not different people who pick up the phone when consumers call. But these particular reports all come out of onsite. And the reason why these reports have a problem is because their other division in Richardson, Texas, same building, same process, got sued in the Stokes case and changed their process. And therefore, they don't have that problem. So the only logical, I think, and factual reading is the onsite website. The other one, the leasing desk, just doesn't have this problem and it's not part of this case. So the definition that you believe you proposed from the outset is limited to the web-based requests? We think it is, but to the extent that the district court did mention in its decision, it's 2200, where I agree with RealPage's counsel, we don't know the extent of the overlap. But certainly in reply and in the reconsideration motion, we said the 16,600 on the onsite website are, you know, entirely uniform, all direct, all asked for a file. We think that definition, if adopted by the court, would work. But if it needs to be reworked, the district court has certainly permitted it to add more clarity. But we think our definition works. Your colleague, Mr. Soutland, made the point that information that was the district court declined to consider in the course of the motion to reconsideration may not be pieces of the record that we should consider if we conclude the district court did not abuse its discretion. That is, the district court declined to consider the information about even the webpage because of the timing of its presentation. Why is that an abuse of discretion given the district court's observation that you had some of the deposition information earlier, you could have taken that deposition, another deposition earlier, and that in making an argument in the footnote, you violated these individual rules? Well, I mean, I think that's a little off field from the Rule 23F issue that this court took. But the reason, you know, our view is that we presented the information about the website in the 1660 originally. The district court, in our view, misread it and wrote a sentence that said through the website, addressing the website issue, a consumer could ask for their report or their file. So we made a supplemental filing that pointed out to the district court that this was a factual error and it should correct it. The district court declined our motion, but I think that was filed in a timely way. It wasn't, I think it's part of the record here and that this court should consider it. Where did you point to or make these arguments about the website in the original briefing? So I don't have that in front of me, Your Honor. I'd be happy to do a 28J, but it was, that's what the district court considered it when it discussed the website and the options on the website, whether it's an and or an or. So I know it's there. I just don't have that handy at the moment. All right. Well, that's quite a day, isn't it? This has to be a record for me, Your Honor. All right. Well, happy holidays to one and all. Thank you for your arguments today. We'll take the matter under advisement. I can't believe I'm having this in person. Thank you. Thank you. Thank you. Take care. Happy holidays.